**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-246 (JMC)** |
| **v.** | : | |
| | : | |
| **JOSHUA HALL,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Joshua Hall to 14 days of incarceration, followed by one year of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution, as well as a $25 special assessment.

## I.    Introduction

Defendant Joshua Hall, a 36-year-old truck driver, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Hall pleaded guilty to violating 18 U.S.C. § 1752(a)(1). The government's recommendation is based on the following facts: (1) Hall understood the potential for violence that existed on January 6 given his internet searches for various weapons and riot gear; (2) Hall brought a painters mask to D.C., consistent with his expectation that he would not merely be attending a peaceful rally; (3) Hall felt the effects of OC spray deployed by the police before climbing a railing, entering the Capitol, and yelling at officers.

The Court must also consider that Hall's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Hall's crime support a sentence of 14 days of incarceration, followed by one year of supervised release.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 25 (Statement of Offense), 1-5.

### Defendant Hall's Role in the January 6, 2021 Attack on the Capitol

Hall began planning his trip to Washington, D.C., at least two weeks before January 6, searching the internet for "hotels DC jan 6th," "DC January 6th," and "DC January 6th armed." On January 4, Hall searched the internet for "collapsible baton," "Where can I buy a taser gun,"

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

"taser," "goggles for pepper spray," "bear mace," and "gun store."  He also visited a website titled "How to Protect Your Eyes at a Protest."

On January 6, 2021, Hall, his girlfriend, and an unidentified companion, traveled to Washington, D.C., from North Carolina, and attended the former President's "Stop the Steal" rally by the Ellipse. *See* ECF No. 27, at ¶ 18.  After the rally, Hall and his companions marched to the Capitol.

Once Hall arrived on Capitol grounds, he made his way to the Upper West Terrace courtyard outside doors known as the Parliamentarian Doors.  At approximately 2:42 p.m., rioters smashed a Parliamentarian Door window and forced their way into the Capitol through that door. Hall, wearing a black hat, grey sweatshirt, and pink respirator mask, climbed over a railing to get to the door:



*Image 1: Screenshot from Exhibit 1 (at 00:20) showing Hall, circled, climbing railing outside of the Parliamentarian Door*

Hall walked through the Parliamentarian Door at 2:42 pm, approximately 15 seconds after it was breached:



*Image 2: Screenshot from Exhibit 2, surveillance footage near the Parliamentarian Door, Hall circled, at approximately 2:42 pm*

Hall's girlfriend does not appear to have joined him. Rather, it seems as though she remained outside of the Capitol. As Hall penetrated further into the Brumidi Corridor, Hall encountered a line of police officers and joined a group of rioters yelling at those officers:



*Image 3: Screenshot from Exhibit 3 (at 00:19) showing Hall, circled in red, in the Brumidi Corridor and one officer in a line of police officers, circled in yellow.*

4



*Image 4: Image of Hall, circled in red, in the Brumidi Corridor*

Hall made his way further into the Capitol, ultimately exiting by the North Door Appointment Desk approximately 14 minutes after he entered the building.

The next day, Hall searched the internet for "facial recognition," "facial recognition capitol building," and "metro pd person of interest." Four days later, he searched "fbi wanted capitol" and looked at the FBI website seeking information on individuals who committed crimes at the Capitol on January 6, 2021.

Image 4 (above) was published on January 6, 2021, in a Washington Post titled "How pro-Trump insurrectionists broke into the U.S. Capitol." Hall saw this article and photo, identified himself in the image and recognized the man standing next to him as Jon Schaffer, the front man of the heavy metal band "Iced Earth." On January 14, 2021, Hall emailed Iced Earth's website and described it as an "honor" to be side by side with Schafer and explained that he did not recognize Shafer in the moment because the "[s]ituation was so hectic."

*Defendant's Interviews*

On February 16, 2021, Hall voluntarily spoke to FBI agents by telephone. During the interview, Hall admitted to entering the Capitol, but said he did not take part in any violence, theft,

or damage to property.  He also falsely claimed that he did not take part in any disorderly conduct. Contradicting this assertion, open source video and images show Hall in the front of a group of rioters screaming at police officers in the Capitol.

On July 28, 2022, Hall voluntarily met with the FBI to discuss his actions on January 6, 2021.  During the interview, Hall admitted that he traveled to Washington D.C. with two individuals, one who he declined to identify.  He said they traveled to D.C. to "let their grievances be known."  Hall said that they listed to the former President's speech and then marched to the U.S. Capitol building.  Hall admitted to being approximately 50 to 100 yards from police officers on the Capitol lawn and admitted to feeling the effects of OC spray used by those officers.  Though he claimed he did not see any destruction of property, in fact—in contrast to what he told the FBI— Hall entered the Capitol seconds after other rioters smashed a window and forced a door open.

*The Charges and Plea Agreement*

Hall was charged by Complaint on May 18, 2023.  On August 1, 2023, pursuant to a written plea agreement, Hall pleaded guilty to a one-count Information charging him with violating 18 U.S.C. § 1752(a)(1) (entering or remaining in a restricted building or grounds). By plea agreement, Hall agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Hall now faces sentencing for violating 18 U.S.C. § 1752(a)(1).  As noted in the plea agreement and by the U.S. Probation Office, Hall faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year. Hall must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[2] | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 25-34.

The U.S. Probation Office calculated Hall's criminal history as a category I based on 0 criminal history points. PSR at ¶ 39.  Accordingly, the U.S. Probation Office calculated Hall's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at zero to 6 months.  PSR at ¶¶ 34, 107.  Hall's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

---

[2] The PSR incorrectly applies this specific offense characteristic because the trespass occurred "at a secure government facility" under U.S.S.G. §2B2.3(b)(1)(A)(i). PSR ¶ at 27. As indicated in Hall's plea agreement, the specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). ECF No. 35 at 3. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no difference to the final offense level.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

**V.     § 4C1.1 and its Application in this Case**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

The Court should not apply § 4C1.1 here because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). The government is not aware of any judge in a January 6 case

8

issuing a lower sentence than it would otherwise have imposed based on § 4C1.1, and the court in *United States v. Nassif*, 21-cr-421 (JDB), specifically rejected such a request where the defendant was convicted of violations of 18 U.S.C. §§ 1752(a)(1), 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D),5104(e)(2)(G).

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in the offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The

## VI.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of 14 days of incarceration, followed by one year of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Hall's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Hall, the absence of violent or destructive acts is not a mitigating factor.  Had Hall engaged in such conduct, he would have faced additional criminal charges.

Here, Hall's criminal conduct included several aggravating factors.  He prepared to meet violence by researching weapons laws in Washington, D.C., and by researching easily concealable weapons, including batons and tasers.  The government has no evidence about what was in the backpack Hall carried into the Capitol, but the internet searches themselves demonstrate that Hall expected more than simply attending a peaceful political rally.  Indeed, he wore a painter's mask when he entered the Capitol to protect him from the effects of the OC spray police deployed to

---

government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

deter rioters from breaching the Capitol.  And when the Parliamentarian Door was forced open, Hall scrambled at the chance to enter the Capitol by climbing over a railing mere seconds after the door was breached.  Finally, after his entry into the Capitol, he came face to face with a line of officers trying to hold back the crowd.  Instead of turning around, he screamed at those officers and then penetrated further into the Capitol. He later described it as an "honor" to stand next to someone he considered a celebrity while screaming at those officers.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days of incarceration in this matter.

### B.  Hall's History and Characteristics

As set forth in the PSR, Hall's criminal history consists of three drug-related convictions, including Possession of Marijuana (2005), Sell or Deliver Heroin (2008), Possession with Intent to Distribute Heroin (2008), and Possession of Heroin (2008).  PSR at ¶¶ 36-38.   Hall also has a history of probation violations, though at least one appears to be due to substance abuse issues. PSR ¶ 37.  Hall has been compliant with his conditions of pre-trial release.

Hall reported a good childhood with positive role models, although his father was absent after his parents' divorce.  PSR at ¶ 46.  And although he has a history of substance abuse, he has been able to maintain sobriety and steady employment.  PSR at ¶¶ 78-84, 90-95.  He also has a supportive family and girlfriend.  PSR at ¶¶ 47, 49, 56, 57.  Despite these stabilizing factors, in the days leading up to January 6, Hall researched weapons and protective gear and came to the Capitol ready for confrontation with the police.  And his post-riot comments exhibited pride rather than remorse.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration.  Hall has never taken steps to denounce his actions on January 6.  When talking to the Probation Officer who conducted his PSR interview, Hall claimed he got "caught up in the crowd."  PSR ¶ 48.  But in the days leading up to the riot, Hall was researching weapons and ways to protect himself during a protest.  PSR ¶ 20.  He showed up with a painter's mask to help mitigate the effects of the OC spray in the air.  Moreover, a week after January 6, he did not describe his actions as "getting caught up in the crowd."  Rather, he described it as an "honor" to stand next to a musician he admired while screaming at police trying to hold back the crowd.  *See* PSR ¶ 18.  The Court should thus view any remorse or statements minimizing his conduct with skepticism at best.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence Hall based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Hall has pleaded guilty to Count One of the Information, charging him with Entering or Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Herendeen*, 21-cr-278 (BAH), the defendant pled guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). Judge Howell sentenced the defendant to 14 days of incarceration. Like Herendeen, Hall contemplated taking weapons with him to Washington, D.C. Gov. Sentencing Mem., *United States v. Herendeen,* 21-cr-278 (BAH), ECF No. 79 at 3. And like Herendeen, Hall entered the Capitol primed for a riot – Hall donned his painter's mask and Herendeen wore goggles and a tactical vest. *Id.* at 9. Both Hall and Herendeen stayed inside the Capitol for around the same amount of time; Hall was inside for 14 minutes and Herendeen remained inside two minutes longer.

In *United States v. Kit*, 22-cr-306 (JMC), the defendant pled guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), and Attempted Carrying a Pistol Without a License, in violation of 22 D.C. Code §§ 4504(a) and 1803. The Court sentenced Kit to 2 months of imprisonment. Like Hall screaming at officers in the Brumidi Corridor, Kit "badgered officers" on January 6. Gov. Sentencing Mem., *United States v.*

*Kit,* 22-cr-306 (JMC), ECF No. 26 at 19.  Unlike Hall, Kit left the Capitol after approximately four minutes inside.  *Id.* at 12. Other factors warranted the higher sentence for Kit than the government recommends for Hall, including his unlawful possession of a stolen firearm and his flight from FBI agents.  *Id.* at 19.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

      Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Hall must pay $500 in restitution, which reflects in part the role

he played in the riot on January 6.[6] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot

at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based

on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of

July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by

the Architect of the Capitol, USCP, and MPD.) Hall's restitution payment must be made to the

Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim

entities. *See* PSR ¶ 126.

## VIII.   Conclusion

      Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these

factors, the government recommends that this Court sentence Hall to 14 days of incarceration,

followed by one year of supervised release. The government also requests that this Court impose

---

against property … including any offense committed by fraud or deceit," "in which an identifiable
victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim,
*see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for
purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012)
(citations omitted).

60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Hall's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

                                 Respectfully submitted,

                                 MATTHEW M. GRAVES
                                 United States Attorney
                                 D.C. Bar No. 481052

By:      *s/ Anna Z. Krasinski*
                                 ANNA Z. KRASINSKI
                                 Assistant United States Attorney
                                 New Hampshire Bar No. 276778
                                 United States Attorney's Office
                                 Detailed from the District of New Hampshire
                                 (202) 809-2058
                                 anna.krasinski@usdoj.gov